IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:16-CV-350-FL

| | | |
|---|---|---|
| WILLIAM T. HANCOCK, SR., Individually and in a representative capacity on behalf of a class of persons similarly situated, | ) ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| AMERICO FINANCIAL LIFE AND ANNUITY INSURANCE COMPANY, INVESTORS LIFE INSURANCE COMPANY OF NORTH AMERICA, and AMERICO LIFE, INC., | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on defendants' motion to dismiss plaintiff's amended complaint for failure to state a claim (DE 36). Briefing having been completed, the issues raised are ripe for ruling. For the following reasons, defendants' motion is granted.

## BACKGROUND

This case returns to this court following dismissal of plaintiff's original complaint, in order entered July 25, 2017, Hancock v. Americo Fin. Life & Annuity Ins. Co., 272 F. Supp. 3d 763, 779 (E.D.N.C. 2017), and mandate of the Fourth Circuit, dismissing appeal and remanding to this court, with instructions to allow plaintiff to amend his complaint. 723 F. App'x 241, 242 (4th Cir. 2018). In accordance with that mandate, plaintiff filed amended complaint on July 11, 2018. Where plaintiff's amended complaint is substantially similar to the original complaint, and where it fails

to state a claim for many of the same reasons relied upon in order entered July 25, 2017, the court reiterates herein many components of that order, augmented through discussion of law and issues raised in the instant amended complaint and briefs of the parties.

Plaintiff commenced this action on October 14, 2016, asserting claims against defendants arising from the sale by defendant Investors Life Insurance Company of North America ("Investors Life") of a "Flexible Premium Adjustable Life Insurance Policy" to plaintiff in February 1985, policy number 303 1163280 (the "policy"), and collection of premiums thereunder through October 2013. Plaintiff claims that defendant Investors Life, in conjunction with the other defendants who are allegedly affiliated entities, breached the terms of the policy.

In his original complaint, plaintiff asserted claims for breach of contract; declaration and injunction; equitable rescission; unjust enrichment and constructive trust; fraudulent suppression and concealment; fraud; breach of duties of good faith and fair dealing; as well as violations of North Carolina's Unfair and Deceptive Trade Practices Act (UDTPA) and Racketeer Influenced and Corrupt Organizations act.

In his amended complaint, plaintiff again asserts claims for breach of contract; declaration and injunction; equitable rescission; unjust enrichment and constructive trust; as well as violation of UDTPA. He has not reasserted the remaining tort claims from the original complaint. Plaintiff continues to seek compensatory, trebled, and punitive damages and certification of the case as a class action on behalf of himself and all others similarly situated, as well as attorney's fees. As before, plaintiff attaches a copy of the policy to the amended complaint. He also relies in this instance upon a declaration of Tim Cody Ryles, Ph.D., an accredited advisor in insurance.

Defendants filed the instant motion to dismiss on August 24, 2018, asserting that all claims fail as a matter of law and should be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6). The court stayed scheduling activities pending decision on the motion. Plaintiff responded in opposition to the instant motion on October 5, 2018, and defendants replied on October 19, 2018.

## STATEMENT OF FACTS

The facts alleged in the complaint[1] may be summarized as follows. On February 15, 1985, defendant Investors Life issued the policy to plaintiff, then 33 years old. (Compl. ¶ 45; see DE 32-2 at 3).[2] A cover letter to the policy, titled "Flexible Premium Adjustable Life Insurance Policy" states, inter alia "We agree to pay the Cash Value to the Owner on the Maturity Date if the Insured is living on that date. All payments made are subject to the policy provisions." (DE 32-2 at 1). The next page includes a table of contents. (Id. at 2).

A "policy specifications" page follows, stating that the "INITIAL SPECIFIED AMOUNT" is $50,000.00 and the "MINIMUM INITIAL PREMIUM" is $41.27. (Id. at 3). It also includes the following note and information:

---

[1] Hereinafter, all references to the "complaint" or "Compl." are to the amended complaint filed July 11, 2018, unless otherwise specified.

[2] In citations to the policy and the briefs of the parties, the court specifies the page number(s) of the document specified on the court's Electronic Case Filing (ECF) system, at the docket entry (DE) number noted (e.g., DE 32-2 at 4), and not the page number printed on the face of the original document (e.g., "Page 3A").

```
NOTE:  THE MATURITY DATE IS THE POLICY ANNIVERSARY NEAREST THE INSURED'S
NINETY-FIFTH BIRTHDAY.  THE AMOUNT OF CASH VALUE PAYABLE ON THE MATURITY
DATE DEPENDS UPON THE AMOUNT OF PREMIUMS YOU PAY.  THERE MAY BE LITTLE CASH
VALUE AVAILABLE ON THE MATURITY DATE.  COVERAGE WILL END PRIOR TO THE
MATURITY DATE SHOWN WHERE EITHER NO PREMIUMS ARE PAID FOLLOWING PAYMENT OF
THE INITIAL PREMIUM OR SUBSEQUENT PREMIUMS ARE INSUFFICIENT TO CONTINUE
COVERAGE TO SUCH DATE.

POLICY NUMBER  303  1163280          DATE OF ISSUE  FEBRUARY 15, 1985

MONTHLY ANNIVERSARY DAY  15          MATURITY DATE  FEBRUARY 15, 2047

INSURED  WILLIAM T HANCOCK, SR       SPECIFIED AMOUNT  $   50,000

AGE AT ISSUE    33                   SEX  MALE

PLANNED PERIODIC PREMIUM  $41.27     PAYABLE   MONTHLY
```

(Id.).  The next four pages comprise a "Table of Expense Charges," "Table of Surrender Charges,"

"Insured Table of Guaranteed Maximum Insurance Rates Per $1000," and "Other Insured Table of

Guaranteed Maximum Insurance Rates Per $1000."  (Id. at 4-7).

The next page contains "GENERAL PROVISIONS" including the following:

## THE CONTRACT

This is your policy. We issued it in consideration of your application and your payment of the minimum initial premium. This policy and the application (and any supplemental application for additional Specified Amounts) make up the whole contract. We agree not to use any statements other than those made in the application or in a supplemental application in challenging a claim or attempting to avoid liability under this policy. The statements made in the application and supplemental applications will be treated as representations and not as warranties. A copy of the application or supplemental application is attached to this policy when issued, or is made part of the policy when changes in the Specified Amount become effective.

(id. at 8), and the following:

**PROCEEDS**

Proceeds, as used in this policy, means the amount payable on the Maturity Date; on the surrender of this policy before the Maturity Date; or upon the death of the Insured.

The proceeds payable on the death of the Insured shall be the Insured's death benefit, less any Indebtedness (money owed the Company). If the policy is surrendered before the Maturity Date, the proceeds shall be the cash surrender value described in the Nonforfeiture Provisions section, less any Indebtedness. On the Maturity Date, the proceeds shall be the cash value, less any Indebtedness. The proceeds are subject to the adjustments described in the following provisions:

1. Misstatement of Age or Sex;
2. Incontestability;
3. Suicide Exclusions;
4. Surrender and Cash Surrender Value;
5. Partial Surrender;
6. Grace Period; and
7. Indebtedness.

(Id.).  The next two pages cover "EXCLUSIONS," "OWNERSHIP AND BENEFICIARY," and

"PREMIUMS," including the following provisions regarding premiums:

## 6 · PREMIUMS

The Date of Issue is the date from which Monthly Anniversary Days, policy months, policy years, and policy anniversaries are determined. The minimum initial premium is due on the Date of Issue. You may pay more than the minimum initial premium on the Date of Issue. But we have the right to limit the amount. Future premiums are payable in advance at our Administrative Office. You may pay future premiums in any amount at any time before the Maturity Date, subject to the limitations described below.

## PLANNED PERIODIC PREMIUMS

Unless you tell us something else in writing, we will send you periodic premium reminder notices for the amount and in the frequency shown on the Policy Specifications page. We have the right to stop sending such notices if we do not receive any premium payment for thirteen policy months. Changes in the amounts or frequency of planned periodic premium payments and payment reminder notices will be subject to our approval. You may change the planned periodic premium to any amount not less than $20. You may not change the planned periodic premium more than twice in a policy year.

(<u>id.</u> at 9), and the following:

> **UNSCHEDULED PREMIUMS**
>
> You may make unscheduled premium payments. They must be at least $100. There must be no indebtedness. We have the right to limit the amount of such payments. We have the right to limit the number of such payments.
>
> **GRACE PERIOD**
>
> If the cash value, less any Indebtedness, on the date before a Monthly Anniversary Day is less than the monthly deduction for the month after that Monthly Anniversary Day, you will have a grace period of 61 days from that Monthly Anniversary Day to pay a premium which is enough to cover that monthly deduction. The cash value and monthly deduction are described in the Nonforfeiture Provisions section. If such premium is not paid within the grace period, all coverage under this policy will end at the end of the grace period. We will mail to the last known address of you and any assignee of record a written notice of insufficient cash value at least 31 days before the end of the grace period. If the Insured dies during the grace period, we will deduct any overdue monthly deductions from the benefits.

(id. at 10).   The "PREMIUMS" section of the policy also includes provisions regarding "reinstatement." (Id.).  Thereafter, the policy includes a section titled "INSURANCE COVERAGE PROVISIONS" providing information about termination of coverage and death benefit.  (Id. at 10-12).

The next section of the policy titled "NONFORFEITURE PROVISIONS" includes the following additional provisions, pertaining to "CASH VALUE" and deductions therefrom:

**CASH VALUE**

On each Monthly Anniversary Day, the cash value shall be calculated as (1), plus (2), plus (3), minus (4) where:

(1) is the cash value on the prior Monthly Anniversary Day.

(2) is all premiums received since the prior Monthly Anniversary Day.

(3) is interest on items (1) and (2).

If premium is received at any time other than the start of a policy month, the rate of interest will be determined pro rata from the date of receipt.

(4) is the monthly deduction for the month after the Monthly Anniversary Day.

On a day other than a Monthly Anniversary Day, the cash value shall be the cash value as of the prior Monthly Anniversary Day; plus all premiums received since the prior Monthly Anniversary Day, increased by interest. The cash value on the Date of Issue shall be the initial premium received, less the monthly deduction for the policy month after the Date of Issue.

(Id. at 12).

The policy then separately defines the "MONTHLY DEDUCTION" to include a charge for "COST OF INSURANCE," which in turn is calculated as set forth in the following provision:

> **COST OF INSURANCE RATES**
>
> The monthly cost of insurance rate is based on the sex, age on the prior policy anniversary, and premium class of the Insured. Monthly cost of insurance rates will be determined by us, based on our expectations as to future mortality of people in the same class. Any change in cost of insurance rates will apply to all people of the same class as the Insured. The cost of insurance rates will never be more than those shown on the Insured Table of Guaranteed Maximum Insurance Rates page. Such guaranteed maximum rates are based on the 1958 Commissioners' Standard Ordinary Mortality Table, Age Nearest Birthday; plus any risk factors for any rated premium class.

(Id. at 13). The table referenced is one of the four initial tables at the front of the policy, which shows the cost of insurance for each age group, between 0 and 94 years. For example, the rate for age 33 (plaintiff's age at policy inception) is 0.29008, whereas the rate for age 65 (plaintiff's age at filing of complaint) is 3.98456. (Id. at 6).

"INTEREST RATE" is defined as set forth in the following provision:

**INTEREST RATE**

The guaranteed interest rate applied in the calculation of cash value is .32737 percent per policy month, compounded monthly. This is the same as 4 percent per year, compounded yearly.

Interest in excess of the guaranteed rate may be applied in the calculation of cash values. Such increased rates will be set in such manner as we may determine. They may change from time to time, but not below the guaranteed rate.

A different rate of interest may be applied to the part of the cash value which secures a policy loan. This rate will not be less than the guaranteed interest rate of .32737 percent per policy month.

(Id.). The policy then includes the following further provisions regarding cash value:

**INSUFFICIENT CASH VALUE**

If the cash value, less any Indebtedness, on the day before a Monthly Anniversary Day is not enough to cover the monthly deduction for the month after such Monthly Anniversary Day, the policy will end as povided in the Grace Period provision.

**CONTINUATION OF INSURANCE**

In the event planned periodic premium payments are not continued, insurance coverage under this policy and benefits provided by rider will be continued until the cash value, less any Indebtedness, is not enough to cover the monthly deduction, except as provided in the Grace Period provision. This provision shall not continue the policy beyond the Maturity Date. It will not continue riders beyond the date for their termination, except as provided in the riders. At the Maturity Date, we will pay you the cash value if the Insured is living.

(Id. at 13).

The remainder of the policy includes provisions concerning surrender, policy loans, settlement options, a waiver of monthly deduction disability benefit rider, an other insured convertible term insurance rider, and a children's term life insurance rider. (See id. at 13-23).

Subsequent to issuance of the policy, defendant Investors Life began to increase plaintiff's monthly premiums "and the cash value of his policy was taken by Investors Life and used to pay itself the increased premium." (Compl. ¶ 54). Plaintiff first became aware of this increase via communications with defendant Investors Life in October 2013. (Id.). At that point, plaintiff became aware that "Investors Life had increased his premiums over a decade earlier and had been taking money from the cash value of the policy to cover the difference between the $44.62 (after a rider was added increasing the initial $41.27 premium) he dutifully paid every month and the steadily increasing premiums [defendant] Investors Life was charging." (Id.). "When Investors Life had completely depleted the cash value of [plaintiff's] policy so that his cash value could no longer be used to pay the increasing premiums, his monthly premium payments skyrocketed from approximately $41.00 a month to $160.00 a month." (Id.).

Defendant Americo Financial Life and Annuity Insurance Company ("Americo") purchased defendant Investors Life in 2008. (Id. ¶ 4). Defendant Investors Life is a wholly owned subsidiary of Americo. (Id.). Defendant Americo Life, Inc. ("ALI") is an insurance company or holding company with Missouri as its state of incorporation and principal place of business. (Id. ¶ 5).

## DISCUSSION

A.    Standard of Review

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009) (citations omitted).

B.    Analysis

    1.    Breach of Contract

Plaintiff asserts that defendants breached the terms of the policy by: (1) assessing or requiring premium payments in amounts higher than rightfully owed by plaintiff; (2) by wrongfully and improperly drafting the policy to be ambiguous and indecipherable with regard to key provisions; and (3) by assessing or requiring cost of insurance charges in excess of those permitted by certain mortality tables. None of these asserted actions, however, constitutes a breach of the policy, for the reasons stated below.

Under North Carolina law, a claim for breach of contract requires a plaintiff to allege "the existence of a contract between plaintiff and defendant, the specific provisions breached, [t]he facts constituting the breach, and the amount of damages resulting to plaintiff from such breach." Cantrell v. Woodhill Enterprises, Inc., 273 N.C. 490, 497 (1968). "Interpreting a contract requires the court

to examine the language of the contract itself for indications of the parties' intent at the moment of execution." State v. Phillip Morris USA Inc., 323 N.C. 623, 631 (2009) (internal citation and quotation omitted). "It is the general law of contracts that the purport of a written instrument is to be gathered from its four corners, and the four corners are to be ascertained from the language used in the instrument." Carolina Power & Light Co. v. Bowman, 229 N.C. 682, 693-94 (1949). "Where a policy defines a term, that definition is to be used. If no definition is given, nontechnical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended." Woods v. Nationwide Mut. Ins. Co., 295 N.C. 500, 505-06 (1978); see Anderson v. Allstate Ins. Co., 266 N.C. 309, 312 (1966).

"Where the terms of the contract are not ambiguous, the express language of the contract controls in determining its meaning and not what either party thought the agreement to be." Crockett v. First Fed. Sav. & Loan Ass'n, 289 N.C. 620, 631 (1976). "The words used in the policy having been selected by the insurance company, any ambiguity or uncertainty as to their meaning must be resolved in favor of the policyholder, or the beneficiary, and against the company." Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co., 276 N.C. 348, 354 (1970). "However, ambiguity in the terms of an insurance policy is not established by the mere fact that the plaintiff makes a claim based upon a construction of its language which the company asserts is not its meaning." Id. "No ambiguity, calling the above rule of construction into play, exists unless, in the opinion of the court, the language of the policy is fairly and reasonably susceptible to either of the constructions for which the parties contend." Id.

"[T]he court must enforce the contract as the parties have made it and may not, under the guise of interpreting an ambiguous provision, remake the contract and impose liability upon the

company which it did not assume and for which the policyholder did not pay." Id. "Where the immediate context in which words are used is not clearly indicative of the meaning intended, resort may be had to other portions of the policy and all clauses of it are to be construed, if possible, so as to bring them into harmony." Id. at 355. "Each word is deemed to have been put into the policy for a purpose and will be given effect, if that can be done by any reasonable construction in accordance with the foregoing principles." Id.; see Robbins v. C. W. Myers Trading Post, Inc., 253 N.C. 474, 477 (1960).

  a.  Premiums

Plaintiff's breach of contract claim based upon increased premiums fails because the policy allows for increased premiums and sets out circumstances in which increased premiums will be necessary to keep the policy active.

Multiple provisions, read in context of the policy as a whole, allow for increased premiums. The cover of the policy states that it is a "flexible premium adjustable life insurance policy," and it says nothing about all premiums remaining constant during the term of the policy. (DE 32-2 at 1). The policy specifications state "THE MINIMUM INITIAL PREMIUM IS $41.27," and the "PLANNED PERIOD PREMIUM [IS] $41.27." (Id.). At the middle of the same page, the specifications provide a "NOTE" stating that "THE AMOUNT OF CASH VALUE PAYABLE ON THE MATURITY DATE DEPENDS UPON THE AMOUNT OF PREMIUMS YOU PAY," and "COVERAGE WILL END PRIOR TO THE MATURITY DATE SHOWN WHERE . . . SUBSEQUENT PREMIUMS ARE INSUFFICIENT TO CONTINUE COVERAGE TO DATE." (Id.) (emphasis added).

These provisions are further informed by additional terms and details in the policies demonstrating that premiums may increase.  For example, the policy states, under bolded heading "INSUFFICIENT CASH VALUE,": "If the <u>cash value</u>, less any Indebtedness, on the day before a Monthly Anniversary Day is not enough to cover the <u>monthly deduction</u> for the month after such Monthly Anniversary Day, the policy will end as provided in the Grace Period provision." (<u>Id.</u> at 13) (emphasis added).  That "GRACE PERIOD" provision provides, in turn: "If the <u>cash value</u>, less any Indebtedness, on the date before a Monthly Anniversary Day is less than the <u>monthly deduction</u> for the month after that Monthly Anniversary Day, you will have a grace period of 61 days from that Monthly Anniversary Day <u>to pay a premium which is enough to cover that monthly deduction</u>." (<u>Id.</u> at 10) (emphasis added).  As such, the policy states in plain terms that a premium payment may be needed "which is enough to cover [the] monthly deduction."  (<u>Id.</u>).  Where the terms "cash value" and "monthly deduction" are further defined in the policy, this provision also points to further details regarding how the premium payment may change.

In particular, under the bold section head "NONFORFEITURE PROVISIONS" and subsection "CASH VALUE," the policy provides:

> On each Monthly Anniversary Day, the <u>cash value</u> shall be calculated as (1), plus (2), plus (3), minus (4) where:
>
> (1) is the cash value on the prior Monthly Anniversary Day.
>
> (2) is all premiums received since the prior Monthly Anniversary Day.
>
> (3) is <u>interest</u> on items (1) and (2). . . .
>
> (4) is the <u>monthly deduction</u> for the month after the Monthly Anniversary Day.

(<u>Id.</u> at 12) (emphasis added).  In turn, the "MONTHLY DEDUCTION" is defined as including a charge for "cost of insurance" calculated according to a table which shows the cost of insurance for

each age group, between 0 and 94 years. The rate for age 33 (plaintiff's age at policy inception) is 0.29008, whereas the rate for age 65 (plaintiff's age at filing of complaint) is over ten times that amount, 3.98456. (Id. at 6). The "interest rate" is defined as a "guaranteed interest rate" of "4 percent per year, compounded yearly," which is a guaranteed minimum insurance rate that "may change from time to time, but not below the guaranteed rate." (Id. at 9).

Accordingly, in order to maintain the cash value of the policy, in light of deductions for cost of insurance, premiums necessarily must rise substantially as the cost of insurance increases ten-times in amount over a period of 30 years, unless there is a corresponding rise in interest rate to offset the increase in monthly deduction. As noted by plaintiff, interest rates did not remain at their initial applicable rate; indeed, "interest rates were certain to decrease," (id. ¶ 53), and in fact "interest rates returned to historic norms." (Id. ¶ 54). Therefore, premium increases were allowed and nearly inevitable based on the terms of the policy and the interest rates applicable to the policy. As such, defendants did not breach the terms of the policy by increasing plaintiff's premiums.

Plaintiff argues that the policy is ambiguous as to whether premiums can rise, pointing to policy provisions that plaintiff contends suggest otherwise. For example, plaintiff notes that the "planned periodic premium" was specified in the policy as $41.27 and that "this nomenclature gives no hint that the premium was variable" and language in the policy "clearly suggests that coverage would continue unless the planned periodic premium payments are not continued." (Pl's Mem. (DE 40) at 12). Plaintiff quotes the "PLANNED PERIODIC PREMIUMS" section of the policy, which states, inter alia, "Changes in the amounts or frequency of planned periodic premium payments and payment reminder notices will be subject to our approval," and "You may change the planned periodic premium to any amount not less than $20." (DE 32-2 at 9). Plaintiff argues that these

provisions make clear that only the insured can increase his premiums, and that defendant Investors Life has no authority to increase premiums.

A policyholder could only interpret the policy in this manner, however, by ignoring key remaining terms in the policy, including those in the "GRACE PERIOD" and "CASH VALUE" provisions. (Id. at 10, 12). The fact that the policyholder can change the amount of planned premium payments does not extinguish other provisions in the policy that require maintenance of cash value, dependent upon an accounting of all premiums received and interest against deductions. (See, e.g, 32-2 at 10 (providing grace period to "pay a premium which is enough to cover that monthly deduction" and stating "[i]f such premium is not paid within the grace period, all coverage under this policy will end at the end of the grace period); 12 (defining "cash value" as including "all premiums received" and interest minus monthly deduction, and then tying monthly deduction to cost of insurance); 13 (providing that "[i]f the cash value, less any Indebtedness, on the day before a Monthly Anniversary Day is not enough to cover the monthly deduction . . . the policy will end as povided [sic] in the Grace Period provision.")) (emphases added).

It is impossible to read all the terms of the policy together, to credit "[e]ach word," and construing all clauses "to bring them into harmony," Wachovia, 276 N.C. at 354, without allowing for increases in premiums to make up for insufficient cash value to maintain coverage. The only way plaintiff's construction of the policy could function, with planned period premiums alone guaranteed to continue coverage until maturity date, would be by deleting altogether or substantially altering multiple provisions of the policy, including the "GRACE PERIOD," "CASH VALUE," "MONTHLY DEDUCTION," "INTEREST RATE," "COST OF INSURANCE," "COST OF INSURANCE RATES," and "INSUFFICIENT CASH VALUE" sections of the policy. (DE 32-2

at 10, 12-13). This court "may not, under the guise of interpreting an ambiguous provision, remake the contract and impose liability upon the company which it did not assume and for which the policyholder did not pay." Wachovia, 276 N.C. at 354.

Other arguments by plaintiff follow a similar pattern. For example, plaintiff contends the "GRACE PERIOD" section "could reasonably lead the average consumer to believe that this grace period provision would apply only if the insured had elected to incur 'indebtedness,' which could occur either by borrowing from the policy's cash value or choosing to decrease the monthly premium payments." (Pl's Mem. (DE 40 at 24). The "GRACE PERIOD" provision, however, is not limited to circumstances in which a policyholder incurs Indebtedness. Rather, the "less any Indebtedness" phrase is necessary because the "CASH VALUE" formula does not itself include a reduction for Indebtedness. (See DE 32-2 at 12). Moreover, limiting the "GRACE PERIOD" provision to instances of Indebtedness would lead to absurd consequences because coverage would continue indefinitely even if the cash value was insufficient to pay the monthly deduction. (Id.).

Plaintiff also suggests that the policy does not allow defendants to use variations in interest rate to require an increase in premiums. For instance, plaintiff argues that "the policy does not state that the interest rate to be used in calculating cash value was variable." (Pl's Mem. (DE 40) at 26). The policy expressly states, however, that "Interest in excess of the guaranteed rate may be applied in the calculation of cash values," and that interest rates "may change from time to time, but not below the guaranteed rate" specified at 4%. (DE 32-2 at 12). The policy also directly ties the cash value, in part, to the amount of interest applied to the prior month's cash value. (Id.). Thus, by virtue of the cash value formula, without an increase in premiums received, the cash value of the policy may decrease in the event of an interest rate decrease.

Plaintiff cites five out-of-circuit district court cases as examples of instances where courts allowed breach of contract claims to continue on the basis that "universal life policies like the one at issue here are ambiguous." (Pl's Mem. (DE 40) at 27-78). These cases, however, are instructively distinguishable for multiple reasons. As an initial matter, two of the cases apply contract law from different jurisdictions that, as stated, is in conflict with North Carolina law as set forth herein. See, e.g., Feller v. Transamerica Life Ins. Co., No. 216CV01378CASAJWX, 2016 WL 6602561, at *10 (C.D. Cal. Nov. 8, 2016) (applying California law and stating "we must accept as correct plaintiff's allegations as to the meaning of the agreement"); EFG Bank AG v. Lincoln Nat'l Life Ins. Co., No. CV 17-02592, 2017 WL 4222887, at *4 (E.D. Pa. Sept. 22, 2017) (applying California law and stating "[t]he Court cannot say at this point that Plaintiffs' understanding is not one that a lay person would have of the Policy.").

Four unpublished district court cases involved claims that defendant insurance companies breached terms of universal life insurance policies by calculating cost of insurance rates using factors not permitted by the policies. See EFG Bank, 2017 WL 4222887, at *1; Brach Family Found., Inc. v. AXA Equitable Life Ins. Co., No. 16-CV-740 (JMF), 2016 WL 7351675, at *1 (S.D.N.Y. Dec. 19, 2016); Feller, 2016 WL 6602561, at *2; Yue v. Conseco Life Ins. Co., No. CV 08-1506 AHM JTLX, 2011 WL 210943, at *1 (C.D. Cal. Jan. 19, 2011). Plaintiffs do not allege facts here supporting an inference that defendant calculated cost of insurance rates using factors not permitted by the policy. Moreover, plaintiffs in those cases alleged that the universal life insurance policies at issue in those cases – which plaintiff here state are "like the one at issue here" – should be interpreted consistently with the court's construction herein. E.g., EFG Bank, 2017 WL 4222887, at *1 ("The policyholder must contribute enough to cover monthly charges which include the cost

of insurance as well as other policy charges; otherwise the policy will enter a grace period and lapse unless additional premiums are paid.").

A final case cited, <u>McBride v. Life Ins. Co. of Virginia</u>, 190 F. Supp. 2d 1366 (M.D. Ga. 2002), is distinguishable because there the plaintiff alleged "he was induced into buying this policy by being promised the premiums were fixed at $151.42 per month," and "[t]his alleged promise came from the selling agent Earl Mann." <u>Id.</u> at 1368. "Mann also allegedly represented that he understood the Life of Virginia policy to remain in force as long as the monthly $151 premium was paid." <u>Id.</u> at 1369. The court also did not engage in a plain language analysis of the policy, noting instead: "The statutory rules of construction provided little or no help in discerning the rights and obligations of the parties in this case," and "[t]he use of parol evidence only further clouded the meaning of the terms in the contracts because the parties' stated intentions vary greatly." <u>Id.</u> at 1374. Plaintiff does not make similar factual allegations here, and the law as stated herein does not allow the court to avoid rules of construction in favor of using parol evidence.

In sum, plaintiff fails to demonstrate a breach of contract based upon increased premiums.

        b.     Improper drafting

Plaintiff asserts that defendants have breached "their contracts of insurance with" plaintiff and putative class members by "wrongfully and improperly drafting universal life insurance policies to be ambiguous and nearly indecipherable" to plaintiff with regard to key contract provisions. (Compl. ¶ 81).

As an initial matter, this part of plaintiff's claim fails as a matter of law because plaintiff has not alleged facts permitting an inference of the existence of any "contracts of insurance" with plaintiff apart from the policy. Thus, drafting provisions of the policy in a certain manner cannot

constitute a breach of "contracts of insurance" because there are no such contracts of insurance alleged in the complaint. Otherwise, it is circular to claim that the drafting of terms in the policy is itself a breach of the policy, where the policy does not restrict itself to being drafted in any particular manner.

Plaintiff suggests that an increase in premiums should not be allowed under the policy without a plain disclosure or illustration of the risk thereof. In particular, plaintiff asserts the policy should have specified "whom may change the amount of the premium paid, that such policies were volatile investment products subject to interest rate market fluctuations[,] and how the cash value of the policy would be drained to pay for the increased cost of insurance over the passage of time." (Id.). The fact that such disclosures could have been made consistent with the operation of the policy in practice, however, proves the point that there is no breach of the policy due to increased premiums.

Moreover, while plaintiff suggests that such statements or illustrations of the risks of the policy should have been disclosed in the policy to benefit the purchasing consumer, in the vein of a regulatory or statutory protection, such disclosures are not required by contract principles to make the policy function as a contract for universal life insurance. Accordingly, plaintiff's breach of contract claim premised upon improper drafting must be dismissed as a matter of law.

c.      Cost of insurance

Plaintiff also asserts that defendants breached the terms of the policy by "wrongfully and improperly assessing or requiring cost of insurance charges in excess of those permitted by mortality tables." (Compl. ¶ 82). Plaintiff recognizes that the policy specifically defines the charges defendants may deduct as cost of insurance charges. (See id. at ¶ 43; see, e.g., DE 32-2 at 6). As

such this claim is not based on the language of the contract, but rather on whether defendants performed under the contract. Plaintiff however, does not allege facts that permit a plausible inference that defendants charged a cost of insurance rate any different from what was specified in the policy. Thus, plaintiff's breach of contract claim on this basis fails for lack of sufficient factual allegations to nudge the claim "across the line from conceivable to plausible." Bell Atl. Corp., 550 U.S. at 547.

Plaintiff suggests that defendants failed to follow certain regulatory or industry standards in determining the amount of cost of insurance rates that they charged. For example, plaintiff asserts in his brief that "[d]efendants breached the Cost of Insurance ('COI') provision of the policy by charging an amount that, upon information and belief, was inconsistent with industry-accepted determinations and, consequently, in excess of true mortality costs under the terms of the policy." (Pl's Mem. (DE 40) at 28). North Carolina contract law, however, requires that the court determine what the contract requires, not what insurance regulations or industry-accepted standards require. See Wachovia, 276 N.C. at 354; Robbins, 253 N.C. at 477. Here, the policy states that "[m]onthly cost of insurance rates will be determined by us, based on our expectations as to future mortality of people in the same class." (DE 32-2 at 13). Plaintiff does not allege facts supporting an inference that defendants breached this standard set forth in the policy.

Plaintiff argues, nonetheless, that "having alleged that the COI has been miscalculated," plaintiff should be allowed to proceed with his breach of contract claim. (Pl's Mem. (DE 40) at 28). However, plaintiff must allege "[t]he facts constituting the breach" of contract. Cantrell, 273 N.C. at 497. Here, plaintiff has not alleged any facts permitting an inference that defendants imposed a

cost of insurance charge that was different from what is specified or allowed under the terms of the policy.

In sum, plaintiff's breach of contract claim must be dismissed as a matter of law for failure to state a claim upon which relief can be granted. Where plaintiff has already been given an opportunity to amend his complaint to allege facts constituting a breach of contract, and plaintiff has failed to do so, dismissal is with prejudice because any further amendment would be futile. In addition, plaintiff's claims for declaration and injunction (count 2), equitable rescission (count 3), and unjust enrichment and constructive trust (count 4), premised upon the same contractual arguments must be dismissed.

2.      Breach of Duties of Good Faith and Fair Dealing

Plaintiff claims that defendants breached duties of good faith and fair dealing by "drafting and marketing of universal life insurance policies which were misleading, ambiguous and essentially indecipherable" to plaintiff. (Compl. ¶ 97). He asserts defendants breached these duties by 1) engaging in unfair and deceptive trade practices, 2) selling life insurance policies without disclosing "that the policy premiums remaining unchanged was completely dependent on interest rates remaining at abnormally high levels," 3) failing to disclose "that such policies were likely to lapse or lose their value unless plaintiff and class members paid significantly higher premiums as interest rates fell," 4) "increasing monthly premiums after policies were issued and depleting the policyholders' cash value to satisfy these wrongful premium increases," and 5) "forcing may policyholders to allow their policies to lapse thereby forfeiting the death benefit for which they had bargained." (Id.).

"In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." Bicycle Transit Auth., Inc. v. Bell, 314 N.C. 219, 228 (1985). "It is a basic principle of contract law that a party who enters into an enforceable contract is required to act in good faith and to make reasonable efforts to perform his obligations under the agreement." Weyerhaeuser Co. v. Godwin Bldg. Supply Co., 40 N.C. App. 743, 746 (1979). However, an asserted implied term cannot be used to contradict the express terms of a contract. See Vetco Concrete Co. v. Troy Lumber Co., 256 N.C. 709, 713 (1962) ("[A]n express contract precludes an implied contract with reference to the same matter.").

Here, plaintiff's claim for breach of implied duty fails because plaintiff has not alleged facts permitting a plausible inference that defendants did "anything which injures the right of the other to receive the benefits of the agreement." Bell, 314 N.C. at 228. Plaintiff has not alleged that defendants took any action that prevented plaintiff from receiving benefits of the policy, according to the terms of the policy. Rather, plaintiff seeks relief based upon asserted implied terms that are not required by the express terms of the contract, as discussed above with respect to plaintiff's breach of contract claims. North Carolina law does not permit such a claim where the express terms of the policy preclude an implied contract with reference to the same matter. See Vetco, 256 N.C. at 713.

In his amended complaint, plaintiff asserts that defendants breached an implied duty of good faith by "drafting and marketing" the policy in a manner that was misleading, ambiguous and essentially indecipherable to plaintiff. (Compl. ¶ 97). However, the implied duty of good faith concerns the parties' performance of obligations under the agreement, not the terms selected for the

agreement.  See Bicycle Transit Auth., 314 N.C. at 228; Weyerhaeuser Co., 40 N.C. App. at 746.

Moreover, plaintiff has not pleaded any facts regarding the marketing of the policy to plaintiff or

its drafting.  Therefore, plaintiff's claim on this basis fails as a matter of law.

Plaintiff also adds to his amended complaint several allegations regarding defendants'

performance under the policy which he contends constitute a breach of implied duty: "[1] increasing

monthly premiums after policies were issued"; " [2] depleting the policyholders' cash value to

satisfy these wrongful premium increases," and   "[3] forcing may policyholders to allow their

policies to lapse thereby forfeiting the death benefit for which they had bargained." (Compl. ¶ 97).

None of these alleged actions, however, was contrary to the express terms of the policy.  First, as

discussed above, the policy allowed for defendants to increase premiums in accordance with the

"grace period" and "cash value" provisions.  (DE 32-2 at 10, 12).  Second, because premium

increases were not "wrongful" as plaintiff asserts, using cash value to satisfy premium increases

enabled policy coverage to continue without lapsing, by virtue of the same provisions.  Finally,

plaintiff does not allege whether his own policy has lapsed, or if it has, plaintiff has not alleged any

facts that it has done so except in accordance with those same provisions.  Therefore, plaintiff has

not alleged defendants have done "anything which injures the right of the other to receive the

benefits of the agreement." Bicycle Transit Auth., 314 N.C. at 228.

Plaintiff suggests that an insurance company owes an exceptional duty of good faith under

the law towards its insured, which defendants breached in this case.  As a general rule, however,

"[a]n insurance company is not a trustee for its insured." Setzer v. Old Republic Life Ins. Co., 257

N.C. 396, 399 (1962).  The case cited by plaintiff for a contrary rule, Richardson v. Bank of Am.,

N.A., 182 N.C. App. 531, 558 (2007), is inapposite because it involved the sale of insurance

products that undisputedly were illegal.  See id. ("We hold that by selling an unlawful insurance product to Plaintiffs with loans greater than fifteen years, NationsCredit breached its duty of good faith and fair dealing as a matter of law.").

Accordingly, plaintiff's claim for breach of implied duty of good faith and fair dealing fails as a matter of law.  Where plaintiff has already been given an opportunity to amend his complaint to allege facts constituting a claim of breach of good faith and fair dealing, and plaintiff has failed to do so, dismissal is with prejudice because any further amendment would be futile.

3.      UDTPA Claim

Plaintiff asserts defendants engaged in unfair and deceptive trade practices by failing to give plaintiff adequate warnings and notice that his policy was "an investment product highly sensitive to interest rate markets and that as a result, [plaintiff's] premiums were substantially certain to increase even though Defendants knew or should have known this was certain to happen."  (Compl. ¶ 102).   Plaintiff contends the policy was "drafted in such a way that its terms concealed the risk [of] future premium increases and policy forfeiture."  (Id. ¶ 106).

Where a cause of action presumes the "existence of an agreement, the terms contained in an agreement, and the interpretation of an agreement," the issues raised must be relegated to the arena of contract law, and are not appropriate for resolution under tort principles. Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 347 (4th Cir. 1998). Under North Carolina law, the court must "limit plaintiffs' tort claims to only those claims which are identifiable and distinct from the primary breach of contract claim." Id. at 346 (quotations omitted).  Furthermore, it is "unlikely that an independent tort could arise in the course of contractual performance, since those sorts of claims

are most appropriately addressed by asking simply whether a party adequately fulfilled its contractual obligations." Strum v. Exxon Co., U.S.A., 15 F.3d 327, 333 (4th Cir. 1994).

"North Carolina's economic loss rule provides that ordinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor." Legacy Data Access, Inc. v. Cadrillion, LLC, 889 F.3d 158, 164 (4th Cir. 2018) (quotations omitted). "It is the law of contract, not tort law, which defines the obligations and remedies of the parties in such a situation." Id. (quotations omitted). In addition, even though "[i]n a sense, unfairness inheres in every breach of contract when one of the contracting parties is denied the advantage for which he contracted, North Carolina law requires a showing of substantial aggravating circumstances to support a claim under the UTPA." Broussard, 155 F.3d at 347 (quotations omitted).

Here, plaintiff's claim is premised upon his assertion that the policy's terms, as he interprets them, do not give adequate warning of its interest rate sensitivity, possibility of premium increases, and risks of policy forfeiture. (Compl. ¶¶ 102-103, 104, 106). Accordingly, plaintiff's claim directly presumes an "interpretation of [the] agreement" in a manner favoring plaintiff's construction of the policy. Broussard, 155 F.3d at 347. Thus, "the issues raised must be relegated to the arena of contract law, and are not appropriate for resolution under tort principles." Id.

In any event, the premise of plaintiff's UDTPA claim is contrary to the plain terms of the policy. As discussed above with respect to the contract claim, the policy provides that interest rates applicable to the policy can change, and that interest rates are a component of determining cash value. (DE 32-2 at 12). The policy also provides for the possibility of increased premiums through operation of the "GRACE PERIOD" "CASH VALUE" and "INSUFFICIENT CASH VALUE" provisions. (Id. at 10, 12-13). Finally, the policy warns that forfeiture is a risk through its

"NONFORFEITURE PROVISIONS" and "GRACE PERIOD" provision, read in conjunction with initial warning on the specifications page that "COVERAGE WILL END PRIOR TO THE MATURITY DATE SHOWN WHERE . . . SUBSEQUENT PREMIUMS ARE INSUFFICIENT TO CONTINUE COVERAGE TO SUCH DATE." (Id.). Therefore plaintiff's claim under the UDTPA that defendant did not provide adequate warnings fails because the contract, by its plain terms, discloses its risks.

Plaintiff suggests nonetheless that even if the policy provides for interest rate sensitivity, possibility of increased premiums, and risks of forfeiture, it does not warn enough or clearly enough of the risks of such negative consequences. Failure to warn enough or clearly enough of the risks of negative consequences of the policy, however, is not a substantial aggravating factor sufficient to state a claim under the UDTPA. Cases and authorities cited by plaintiff are instructively distinguishable in this respect.

For example, plaintiff points to N.C. Gen. Stat. § 58-63-15, which defines a number of activities "as unfair methods of competition and unfair or deceptive acts or practices in the business of insurance," comprising: (1) "misrepresenting the terms of any policy issued or to be issued or the benefits or advantages promised thereby," (2) "False Information and Advertising Generally," (3) "Defamation," (4) "Boycott, Coercion and Intimidation," (5) "False Financial Statements," (6) "Stock Operations and Insurance Company Advisory Board Contracts," (7) "Unfair Discrimination," (8) "Rebates," (9) "Advertising of Health, Accident or Hospitalization Insurance," (10) "Soliciting," (11) "Unfair Claim Settlement Practices," (12) "Misuse of Borrowers' Confidential Information," and (13) "Overinsurance in Credit or Loan Transactions."

Notably, however, the statute does not include in this list failing to warn enough or clearly enough of the risks of negative consequences a life insurance product. Plaintiff's allegations also do not fall under any of the categories of conduct listed. While the UDTPA provides a remedy for unfair and deceptive conduct generally broader than the enumerated violations in § 58-63-15, plaintiff does not cite any case holding that a UDTPA claim is stated based upon conduct comparable to that alleged herein in the context of an insurance policy. Cf. Gray v. N. Carolina Ins. Underwriting Ass'n, 352 N.C. 61, 73 (2000) (holding insurance company violated UDTPA where it "did not attempt in good faith to effectuate prompt, fair and equitable settlements of claims in which liability had become reasonably clear"); Pearce v. Am. Def. Life Ins. Co., 316 N.C. 461, 472 (1986) (upholding UDTPA verdict where plaintiff "relied to his detriment upon the statements in [a] letter" sent by employee of insurance company falsely stating that there was coverage where the terms of the policy provided no coverage).

Plaintiff also points to North Carolina insurance regulations which provide certain requirements for "non-level premiums." (Pl's Mem. (DE 40) at 35 (citing 11 N.C. Admin. Code 12.0427(h)). Plaintiff has not, however, pleaded facts regarding any advertisements of defendants, supporting claims based upon violations of such North Carolina insurance regulations.

In sum, plaintiff fails to state a claim for a violation of the UDTPA. Accordingly, this claim must be dismissed as a matter of law. Where plaintiff has already been given an opportunity to amend his complaint to allege facts constituting a UDTPA violation, and plaintiff has failed to do so, dismissal is with prejudice because any further amendment would be futile.[3]

---

[3] Because all claims are dismissed with prejudice, the court does not reach defendants' additional argument that there is no viable theory for holding defendants Americo and ALI liable for defendant Investors Life's actions.

29

## CONCLUSION

Based on the foregoing, defendant's motion to dismiss (DE 36) is GRANTED.  Plaintiff's claims are DISMISSED for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6).  This dismissal is WITH PREJUDICE, where the court has determined that no further amendment will cure the defects in the complaint, for the reasons set forth herein.  The clerk is DIRECTED to close this case.

SO ORDERED, this the 29th day of March, 2019.

LOUISE W. FLANAGAN
United States District Judge